IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

ROBYN HAYNES and ERIC JACKSON,    )
                                  )
            Plaintiffs,           )
                                  )
      v.                          )        1:12cv1090
                                  )
CITY OF DURHAM, N.C., MARK        )
WENDELL BROWN, JR.; DANNY         )
REAVES; TIMOTHY STANHOPE;         )
LAWRENCE VAN DEWATER; VINCENT     )
PEARSALL; and JERRY YOUNT,        )
                                  )
            Defendants.           )

## MEMORANDUM OPINION AND ORDER

THOMAS D. SCHROEDER, District Judge.

　　　Plaintiffs Robyn Haynes and Eric Jackson bring this action against six Durham Police Department officers ("the Officer Defendants") and the City of Durham ("the City") pursuant to 42 U.S.C. § 1983 for various alleged violations of Plaintiffs' federal constitutional rights. Plaintiffs also allege several causes of action under the common law and Constitution of North Carolina. Before the court are the Officer Defendants' motion for partial summary judgment (Doc. 45) and the City's motion for summary judgment on all claims against it (Doc. 53). For the reasons set forth below, both motions will be granted. In addition, Plaintiffs move to exclude testimony from an expert witness. (Doc. 39.) For the reasons set forth below, Plaintiffs' motion will be denied.

**I. BACKGROUND**

The facts of the case, viewed in the light most favorable to Plaintiffs as the nonmoving parties, are as follows:

On the morning of October 8, 2009, Jackson borrowed Haynes' car and drove it from a convenience store to his nearby home in Durham, North Carolina. (Doc. 51 at 24:10-15, 36:9-14, 37:11-23, 38:24-39:9.) After Jackson parked the car and began walking toward his home, Officer Mark Wendell Brown approached in his patrol car and ordered Jackson back into Haynes' car. (Id. at 39:2-11.) Jackson complied and produced his driver's license and Haynes' registration. (Id. at 40:11-20.) Brown refused to tell Jackson why he was being detained.[1] (Id. at 40:11-41:6.) Brown returned to his patrol car to write a citation, leaving Officer Lawrence Van Dewater with Jackson. (Doc. 48 at 13:20-14:3.)

While Brown was writing the citation, he called a K-9 unit to search for illegal drugs. (Id. at 14:6-13, 19:2-9.) The unit arrived and a dog was deployed, but the dog did not alert to the presence of illegal narcotics. (Id. at 22:5-6.) Brown then gave

---

[1] According to Brown, Jackson was stopped for failing to maintain lane control after Brown observed Jackson driving in the middle of the road. (Doc. 48 at 12:1-8.) Brown claims that he initially suspected that Jackson might be drunk, but Jackson explained that he usually drove in the middle of that road to avoid children playing in the street. (Id. at 12:9-13:11.) Jackson denies that he drove in the middle of the road or that this conversation took place. (Doc. 51 at 41:1-10.)

2

Jackson a citation for failing to maintain lane control and terminated the encounter. (Id. at 24:15–25:4.) Jackson went inside his home (Doc. 51 at 48:9–24)[2] while the officers retreated to a nearby side street and continued to monitor Jackson's home (Doc. 48 at 23:4–15).

Sometime later, Jackson emerged from his home and rolled a trash can to the street. (Doc. 51 at 48:9–24.) Brown inspected the contents of the trash can, finding loose tobacco shavings.[3] (Id. at 53:1–11.) Believing this to be evidence of drug paraphernalia, Brown left to get a search warrant. (Doc. 51 at 53:1–11.) Corporal Vincent Pearsall approached Jackson's home and stood in the front doorway, preventing Jackson from closing the door. (Id. at 26:4–10.) Van Dewater and several other unidentified officers congregated on the front steps and in the street in front of Jackson's driveway. (Id. at 58:6–13.)

Jackson eventually tried to close the front door to his home. (Id. at 18–19:3.) This prompted Pearsall to yell, "Lock it down." (Id.) Pearsall and Van Dewater entered Jackson's living room,

---

[2] Van Dewater allegedly told Brown that Jackson had stated that the dog would not alert to any narcotics because his drugs were wrapped too tightly, or something to that effect. (Doc. 48 at 22:17–21.) Because Jackson denies making any such statement (Doc. 51 at 46:23–47:5), the court does not consider it.

[3] Brown claims that he found the "hollowed out insides of cigars," as well as empty sandwich bags with the corners cut off. (Doc. 48 at 27:4–22.) Jackson admits that Brown found loose cigar tobacco in the trash can, but Jackson did not observe any bag corners. (Doc. 51 at 53:1–55:10.)

another officer used his cruiser to block Haynes' car in the driveway, and several other officers took up positions on Jackson's front porch. (Id. at 59:4–60:9, 64:2–14.) Feeling threatened, Jackson went outside and called 911 from his cell phone. (Id. at 61:3–9.) The officers then placed Jackson in handcuffs. (Id. at 61:10–12.)

At some point,[4] Officer Jerry Yount arrived in response to Jackson's 911 call and observed the other officers surrounding Jackson's house. (Doc. 47 at 11:24–12:5.) Pearsall informed him that the officers were holding the house while they applied for a search warrant. (Id. at 17:6–12.) Pearsall then stepped away so that Jackson could speak freely with Yount. (Id. at 12:16–13:14.) Jackson told Yount that the officers were harassing him. (Id. at 19:2–5.) Yount responded that he would take Jackson's complaint, but that any report would need to be passed on to the district commander.[5] (Id. at 12:16–13:14.) Jackson replied that he did not need to speak with Yount, and Yount left the scene.[6] (Id.)

---

[4] Yount testified that Jackson was not in handcuffs when he arrived on the scene. (Doc. 47 at 30:1–8.) Nevertheless, Yount got the impression that Pearsall did not want Jackson to leave the scene. (Id. at 29:21–25.)

[5] Jackson does not remember speaking to Yount. (Doc. 51 at 62:4–63:11.)

[6] Yount testified that he was present at Jackson's house for a total of three minutes. (Doc. 47 at 7:17–8:5.) Jackson testified that Yount was present for "[m]aybe 20, 30 minutes." (Doc. 51 at 63:3–6.)

4

Eventually, Brown returned with a search warrant for Jackson's home and vehicle. (Doc. 51 at 64:21—65:5.) Jackson was placed in the backseat of a police car with the heat turned all the way up and the radio at full volume. (Id. at 65:11—66:3.) The officers then searched Jackson's home, finding a "tannish powdery substance" on a shelf in an upstairs bedroom.[7] (Doc. 60 at 22:21—23:12.) Meanwhile, other officers searched Haynes' car, disassembling the vehicle as needed to search for hidden compartments. (Doc. 49 at 21:13—24:6.) Noticing a white powdery substance in the air ducts and vents behind a door panel, the officers removed the vents from the car for further testing.[8] (Id. at 23:16—25:11.)

Jackson was arrested and transported to the Durham County Jail. (Doc. 51 at 76:23—77:2.) He was ultimately charged with possession of heroin and cocaine. (Id. 78:1—3.) Confirmatory testing at the North Carolina State Crime Laboratory revealed that the substances found in Haynes' car was sugar, and that the substance found in Jackson's home was tergitol, a chemical used in some detergents. (Doc. 59 at 29:18—32:7.) On January 12, 2010, the State dropped the criminal charges against Jackson. (Doc. 51

---

[7] Pearsall testified that this substance tested positive in the field for heroin. (Doc. 50 at 11:10—20.) Angela Thomas, a civilian present in Jackson's home that day, testified that the substance tested negative in the field. (See Doc. 58 at 51:2—12.)

[8] Officer Timothy Stanhope testified that this substance tested positive in the field for cocaine. (Doc. 49 at 23:19—24:6.)

5

at 90:3—9.)  This action followed.

## II. **ANALYSIS**

### A. **Standard of Review**

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).  The moving party bears the burden of establishing that no genuine dispute of material fact remains.  Where the nonmoving party has the burden of proof, the moving party is entitled to summary judgment if it demonstrates that the nonmoving party's evidence is insufficient to establish an essential element of her claim.  Celotex Corp. v. Catrett, 477 U.S. 317, 322—23 (1986). But summary judgment will not be granted where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  For the purposes of these motions, the court regards statements of the nonmoving party as true and draws all justifiable inferences in the nonmoving party's favor.  Id. at 255.  But a nonmoving party must establish more than the "mere existence of a scintilla of evidence to support his position." Id. at 252.  If the evidence is "merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249—50 (citations omitted).  Ultimately, summary judgment is appropriate where the nonmoving party fails to offer "evidence on which the

6

jury could reasonably find for the plaintiff." Id. at 252.

**B.  Unopposed Motions**

Plaintiffs do not oppose summary judgment in favor of Defendants on many of the counts in this case.  For example, Plaintiffs indicate that they do not intend to pursue claims against the City with regard to Counts I through IV.[9]  (Doc. 57 at 5.)[10]  Similarly, Plaintiffs do not dispute that their claims against the City in Counts VII through X are derivative of claims against the Officer Defendants that were dismissed by a prior order of this court.  (Id. at 4.)  Finally, Plaintiffs concede that their claims against the City for common law malicious prosecution and negligent supervision (Counts XI and XII) are barred by the doctrine of sovereign immunity.  (Id. at 11—12.)  Accordingly, the court will enter summary judgment in favor of the City on Counts I through IV and VII through XII.

Plaintiffs also do not oppose the Officer Defendants' motion for summary judgment on Plaintiffs' § 1983 claim for concealment of evidence (Count III).  (Id. at 8—9.)  Although Plaintiffs disagree with the characterization of this claim as duplicative of

---

[9] Plaintiffs contend that the City's motion with regard to Counts I through IV should be denied as moot because Plaintiffs did not bring these claims against the City.  (Doc. 57 at 5.)  In a prior order, however, the court substituted the City as the real party in interest on all of Plaintiffs' claims against the Officer Defendants in their official capacity, including Counts I through IV.  (Doc. 30 at 10.)

[10] Plaintiffs' response briefs inexplicably do not contain page numbers, as required by Local Rule 7.1(a).  (See Docs. 56, 57.)

the other § 1983 claims, they do not oppose a grant of summary judgment in favor of the Officer Defendants on Count III so long as they are permitted to present evidence regarding the Officer Defendants' alleged concealment. (Id.) Accordingly, the court will enter summary judgment in favor of the Officer Defendants on the concealment claim in Count III,[11] with the condition that doing so does not preclude Plaintiffs from presenting otherwise admissible and relevant evidence of the Officer Defendants' alleged concealment of evidence or any damages flowing therefrom.

### C.  Section 1983 Claims Against Yount

The Officer Defendants move for summary judgment on Plaintiffs' remaining claims against Yount. In a prior order, the court dismissed most of the claims against Yount because the complaint did not allege that he searched Jackson's home or Haynes' car or otherwise contributed directly to Plaintiffs' alleged injuries. (Doc. 30 at 7—9.) As a result, the court concluded that Yount could only be liable on indirect theories, such as civil conspiracy or bystander liability under § 1983. (Id.) After discovery, the Officer Defendants now argue that Plaintiffs have failed to produce sufficient evidence from which to infer that Yount could be liable as a conspirator or bystander.

---

[11] Count III also contains a claim for conspiracy to conceal evidence, which the court dismissed against the Officer Defendants in a prior ruling. (Doc. 30 at 19.)

8

An officer is liable for § 1983 violations committed by other individuals if the officer conspired to do so. See Hafner v. Brown, 983 F.2d 570, 578 (4th Cir. 1992). "To establish a civil conspiracy under § 1983, [plaintiffs] must present evidence that [the defendants] acted jointly in concert and that some overt act was done in furtherance of the conspiracy." Hinkle v. City of Clarksburg, 81 F.3d 416, 421 (4th Cir. 1996). Although plaintiffs "need not produce direct evidence of a meeting of the minds," they "must come forward with specific circumstantial evidence that each member of the alleged conspiracy shared the same conspiratorial objective." Id.

Absent evidence that a defendant knew that others planned to engage in unlawful conduct, a defendant's mere presence does not justify an inference of a civil conspiracy. See, e.g., Lewis v. Gupta, 54 F. Supp. 2d 611, 619 (E.D. Va. 1999) (father not liable for civil conspiracy when he was present at meetings in which his daughter made false statements to the police but there was no allegation that he knew his daughter was lying); see also Harding v. United States, 182 F.2d 524, 526 (4th Cir. 1950) (holding, in the criminal context, that "[m]ere presence is not enough to justify an inference of a conspiracy"). "Acquiescence can amount to a conspiracy agreement," however, when "one police officer watches an open break of the law and does nothing to seek its prevention." Hafner, 983 F.2d at 578 (holding a police officer

9

liable for conspiracy when he watched his fellow officers beat a suspect who had already been subdued). In the absence of such an open violation of law, however, a conspiracy cannot be proved simply through "speculation and the piling of inferences." See Hinkle, 81 F.3d at 426.

Along similar lines, an officer may also be liable for § 1983 violations committed by other individuals under a theory of bystander liability. Randall v. Prince George's Cty., 302 F.3d 188, 203 (4th Cir. 2002). "The concept of bystander liability is premised on a law officer's duty to uphold the law and protect the public from illegal acts, regardless of who commits them." Id. Thus, an officer may be held liable as a bystander if he "(1) knows that a fellow officer is violating an individual's constitutional rights; (2) has a reasonable opportunity to prevent the harm; and (3) chooses not to act." Id.

Here, Plaintiffs have failed to produce evidence to support a finding that Yount knew that his fellow officers were violating Plaintiffs' constitutional rights. Yount testified that he did not work directly with the other Officer Defendants (Doc. 47 at 9:6–10:25, 24:25–25:8), whom he believed were waiting for a search warrant (id. at 11:24–12:11). He did not ask them what they were doing because he assumed they had probable cause and appeared to be following standard procedures. (Id. at 15:13–21, 19:22–20:8.) Finally, he says that he left the scene before the other officers

began to search Jackson's home and Haynes' car. (<u>Id.</u> at 16:7—12, 25:11—26—8.)

Plaintiffs have offered no evidence to rebut Yount's testimony. Instead, Plaintiffs argue that a reasonable jury could infer that Yount shared a conspiratorial objective with the other officers. To support this assertion, Plaintiffs note that Yount responded to a 911 call requesting a police supervisor (<u>id.</u> at 18:3—12), was present on the scene for as long as thirty minutes (Doc. 51 at 63:3—9),[12] saw the other officers locking down Jackson's home (Doc. 47 at 15:13—21), spoke briefly with at least one of the officers (Doc. 51 at 63:3—9), and heard Jackson complain about police harassment (Doc. 47 at 19:2—5). If the other officers had been engaged in an "open break of the law," then perhaps a reasonable jury could infer Yount's knowledge of the violations, and therefore a conspiratorial objective, from his acquiescence. <u>See Hafner</u>, 983 F.2d at 578. But undisputed testimony reveals no basis from which Yount should have concluded that the other officers were engaged in an open break of the law while he was on the scene, but rather indicates that they appeared to be following the proper procedures and protocols. (Doc. 47 at 15:13—21, 19:22—20:8.) Furthermore, Yount testified that civilians routinely ask

---

[12] Jackson testified that Yount was present for "[m]aybe 20, 30 minutes." (Doc. 51 at 63:3—6). Yount testified that, based on his review of 911 records, he was only present at Jackson's home for three minutes. (Doc. 47 at 7:17—8:5.)

11

to speak to a supervisor when they do not like what other officers are telling them. (Doc. 47 at 18:3–12.) In the absence of any evidence to suggest that Yount knew that the other officers had or intended to violate the law, this circumstantial evidence is "probative of a conspiracy only through speculation and the piling of inferences." See Hinkle, 81 F.3d at 426.

In sum, undisputed evidence establishes that Yount was present at Jackson's home for a limited period of time, engaged in minimal communication with Jackson and the other officers, observed the officers behaving in a manner that appeared to be consistent with proper police procedures, and left before the other officers searched Jackson's person, home, and car. Thus, even when viewed in the light most favorable to Plaintiffs, the evidence is insufficient to support a finding that Yount knew that the other officers were violating Jackson's rights. Such knowledge is necessary to establish a claim for either civil conspiracy or bystander liability under § 1983. See Hinkle, 81 F.3d at 421; Randall, 302 F.3d at 203. Accordingly, the court will enter summary judgment in favor of Yount on these claims.

**D. Section 1983 Claims Against the City**

In addition to the claims against the Officer Defendants, Plaintiffs also bring two § 1983 claims against the City for "municipal liability" (Count V) and "supeervisory [sic] liability" (Count VI). (Doc. 1 at 20–21.) "[A] municipality cannot be held

12

liable under § 1983 on a *respondeat superior* theory." Monell v. Dep't of Soc. Servs., 436 U.S. 658, 691 (1978). Rather, to establish liability against a municipality, a § 1983 plaintiff must show the existence of an official policy or custom that is fairly attributable to the municipality and that proximately caused the deprivation of a constitutional right. Pettiford v. City of Greensboro, 556 F. Supp. 2d 512, 530 (M.D.N.C. 2008) (quoting Jordan ex rel. Jordan v. Jackson, 15 F.3d 333, 338 (4th Cir. 1994)). Municipal policy can be found in (1) written ordinances and regulations, (2) affirmative decisions of policymaking officials, or (3) omissions by policymaking officials that manifest deliberate indifference to the rights of citizens. Carter v. Morris, 164 F.3d 215, 218 (4th Cir. 1999). In addition to these formal decision-making channels, a municipal policy may also arise "if a practice is so 'persistent and widespread' and 'so permanent and well settled as to constitute a "custom or usage" with the force of law.'" Id. (quoting Monell, 436 U.S. at 691.)

Here, Plaintiffs have presented no evidence regarding an improper ordinance or regulation, nor have they alleged a persistent widespread practice encouraging police officers to engage in illegal searches and seizures or to arrest citizens without probable cause. Instead, Plaintiffs primarily argue that any improper actions taken by the Officer Defendants are attributable to affirmative decisions by a policymaking official.

13

To support this assertion, Plaintiffs cite the following passage from Van Dewater's deposition:

> Q: All right. How did you become aware of this call, for lack of a better word? Were you dispatched to the scene? Or did you just hear chatter over the radio?
>
> A: No. As team members, we stay close to each other and when it's called out on the radio, we check in with each other. Because we're all part of a team. We don't answer dispatch calls so ...
>
> Q: Say that again.
>
> A: We don't answer dispatch calls. We -- our unit is a street-level unit where we work together. We actually, basically, do whatever the captain wants us to do.
>
> Q: Gotcha.
>
> A: So ...
>
> Q: And your unit was the HEAT unit?
>
> A: Yes.
>
> Q: Is that right? H-E-A-T?
>
> A: Yes. High Enforcement Abatement Team it's called.
>
> Q: Right. And so that unit doesn't -- isn't dispatched to calls?
>
> A: No. What the High Enforcement Abatement Team's responsibilities are is we go to high-crime areas, and we try to abate or lessen crime, whether by traffic stops or citations, making arrests. Basically, like, if a citizen complains about something in their area, maybe drugs or -- like, anything that captain wants us to do or what we're assigned to do, that's what we do. We work together as a team.

(Doc. 60 at 10:13–11:14.) Plaintiffs characterize this passage as an "admission" that the HEAT unit's "captain was the City's

14

official with final policymaking authority over the conduct giving rise to Plaintiffs' claims, and that Officer Van Dewater and his co-defendants were doing what the City's senior policy-making official wanted them to do."  (Doc. 57 at 6.)

Plaintiffs both mischaracterize and overstate Van Dewater's testimony.  Van Dewater did not state or imply that his captain instructed or encouraged the Officer Defendants to do anything improper.  And even if Van Dewater had, his testimony does not provide any evidence to support Plaintiffs' assertion that the unidentified police captain had official policymaking authority on behalf of the City.  See Pembaur v. City of Cincinnati, 475 U.S. 469, 482–83 (1986) ("The fact that a particular official — even a policymaking official — has discretion in the exercise of particular functions does not, without more, give rise to municipal liability based on the exercise of that discretion.  The official must also be responsible for establishing final government policy respecting such activity before the municipality can be held liable.") (citations omitted); Spell v. McDaniel, 824 F.2d 1380, 1386 (4th Cir. 1987) ("'[P]olicymaking authority' implies authority to set and implement general goals and programs of municipal government, as opposed to discretionary authority in purely operational aspects of government.").[13]

---

[13] Troubling, this is not the only instance of Plaintiffs plainly

Plaintiffs also argue that a reasonable jury could find that the City was deliberately indifferent to the rights of its citizens based on the Officer Defendants' failure to report their alleged constitutional violations and the City's corresponding failure to investigate complaints related to the incident. (Doc. 57 at 7.) Even assuming that this conduct amounted to deliberate indifference, however, it unquestionably occurred after the Officer Defendants searched Haynes' car and arrested Jackson. As a result, the City's alleged indifference could not possibly have been a proximate cause of Plaintiffs' injuries. See Pettiford,

---

mischaracterizing the parties' testimony or positions in this case. Plaintiffs claim that the Officer Defendants acknowledge "the absence of probable cause," "false statements and material omissions made to mislead a magistrate into issuing the search warrant," "the lack of evidence of cocaine or heroin," and that field testing "showed that the suspected controlled substances were not controlled substances." (Doc. 56 at 8.) The Officer Defendants deny such claims, and the court can find no evidence that any officer testified that any such wrongdoing took place. Plaintiffs appear to base this bold assertion on a single statement from an argument regarding duplicative counts in the complaint. Specifically, the Officer Defendants argued that Count III (conspiracy to conceal evidence) is duplicative of Counts I and II because "Mr. Jackson is already seeking relief, and already has a claim, arising out of" the search of his home and vehicle. (Doc. 46 at 18.) This statement cannot be fairly claimed to be an admission of wrongdoing. Similarly troubling, Plaintiffs assert that the "universal understanding of every officer involved . . . was that there was no probable cause" to search or seize Jackson or Haynes' car. (Doc. 57 at 7-8.) There is no evidence any officer had such an understanding; it is only a contention. Finally, Plaintiffs claim that the City suffers from "persistent and widespread failures to document police use of force generally." (Doc. 57 at 7.) But apart from the accusations regarding Jackson and Haynes in this case, Plaintiffs have not alleged, much less provided evidence to support, any instance of wrongful conduct by the City or the Durham Police Department. Such statements exceed the bounds of zealous advocacy, are mischaracterizations of the record, and needlessly complicate the court's review of the record. Plaintiffs are admonished that any further mischaracterization of the record will be addressed by the court. See Fed. R. Civ. P. 11(b)(3).

556 F. Supp. 2d at 530 (explaining proximate cause as an element of a cause of action against a municipality under § 1983).

In sum, Plaintiffs have failed to produce any evidence of an improper official policy or custom of the City or evidence from which a reasonable jury could find it to be a proximate cause of Plaintiffs' injuries. As a result, the court will grant summary judgment to the City on Plaintiffs' claims for <u>Monell</u> and supervisory liability (Counts V and VI).

### E. State Constitutional Claim Against the City

The City also moves for summary judgment on Plaintiffs' claims for alleged violations of the North Carolina Constitution (Count XIII). The complaint alleges that the City, acting through the Officer Defendants in their official capacities, violated Plaintiffs' rights under Article I, §§ 19 and 21 of the North Carolina Constitution. (Doc. 1 ¶¶ 144–49.) Those provisions protect Plaintiffs' rights to due process of law, equal protection of the laws, and freedom from illegal restraint. N.C. Const. art. I, § 19 ("No person shall be . . . deprived of his life, liberty, or property, but by the law of the land. No person shall be denied the equal protection of the laws."), § 21 ("Every person restrained of his liberty is entitled to a remedy to inquire into the lawfulness thereof, and to remove the restraint if unlawful."). Plaintiffs specifically pleaded these claims as a backup "in the event that their state law remedies are inadequate to compensate

17

them for the deprivation of their state constitutional rights."
(Doc. 1 ¶ 148.)

The North Carolina Constitution does not provide an explicit cause of action for citizens to enforce their rights. State Constitutional rights are self-executing, however. See Midgett v. N.C. State Highway Comm'n, 260 N.C. 241, 249–50, 132 S.E.2d 599, 608 (1963), overruled in part by Lea Co. v. N.C. Bd. of Transp., 308 N.C. 603, 304 S.E.2d 164 (1983). "Therefore, in the absence of an adequate state remedy, one whose state constitutional rights have been abridged has a direct claim against the State under our Constitution." Corum v. Univ. of N.C. ex rel. Bd. of Governors, 330 N.C. 761, 782, 413 S.E.2d 276, 289 (1992). Before allowing a claim to proceed directly under the North Carolina Constitution, a court "must bow to established claims and remedies where these provide an alternative to the extraordinary exercise of its inherent constitutional power." Corum, 330 N.C. at 784, 413 S.E.2d at 291. If an adequate statutory or common law remedy exists at state law, a plaintiff may not proceed with a direct constitutional claim. See Copper ex rel. Copper v. Denlinger, 363 N.C. 784, 788–89, 688 S.E.2d 426, 428–29 (2010).

A state-law remedy is adequate when "assuming the plaintiff's claim is successful, the remedy would compensate the plaintiff for the same injury alleged in the direct constitutional claim." Estate of Fennell ex rel. Fennell v. Stephenson, 137 N.C. App.

18

430, 437, 528 S.E.2d 911, 915–16 (2000), rev'd in part on other grounds, 354 N.C. 327, 554 S.E.2d 629 (2001); see also Davis v. Town of Southern Pines, 116 N.C. App. 663, 675–76, 449 S.E.2d 240, 248 (1994) (finding that a plaintiff's false imprisonment claim, if successful, would compensate for the injury the plaintiff claimed in a constitutional claim for unlawful restraint); Googerdy v. N.C. Agric. & Tech. State Univ., 386 F. Supp. 2d 618, 629–30 (M.D.N.C. 2005) (collecting cases); Olvera v. Edmundson, 151 F. Supp. 2d 700, 705 (W.D.N.C. 2001) ("Because a wrongful death claim could compensate Plaintiff for the same injuries (death) as the state constitutional law claim, the latter must be dismissed.").

Accordingly, a state-law remedy is not inadequate simply because the plaintiff must assert his claim against a public official in his individual capacity, rather than against the State. See Rousselo v. Starling, 128 N.C. App. 439, 448, 495 S.E.2d 725, 731 (1998) (holding that claims against a highway patrolman in his individual capacity provided adequate state-law remedies to preclude direct constitutional claims because "Corum did not hold that there had to be a remedy against the State of North Carolina in order to foreclose a direct constitutional claim."); Phillips v. Gray, 163 N.C. App. 52, 57–58, 592 S.E.2d 229, 233 (2004) (affirming summary judgment on a plaintiff's state constitutional claim where the plaintiff also had a common law wrongful discharge

19

claim against a sheriff in his individual capacity); <u>Johnson v.</u> <u>Causey</u>, No. COA09-1712, 701 S.E.2d 404, 2010 WL 4288511, at *10 (N.C. Ct. App. Nov. 2, 2010) (unpublished table opinion) (holding that claims against a deputy sheriff in his individual capacity provided an adequate state-law remedy to preclude a constitutional claim against a sheriff in his official capacity).[14]  This is true even if the plaintiff's burden of proof on his state-law claim may be different, or if the claim may be subject to additional affirmative defenses, like public official immunity.  <u>See</u> <u>Debaun</u> <u>v. Duszaj</u>, --- N.C. App. ---, 767 S.E.2d 353, 357 (2014) ("[T]he fact that plaintiff must overcome the affirmative defense of public officer immunity to succeed on his tort claims does not negate their adequacy as a remedy."); <u>Rousselo</u>, 128 N.C. App. at 448-49, 495 S.E.2d at 731-32 (concluding that a common law trespass to chattels claim was not inadequate "merely because [it] might require more of" the plaintiff than a constitutional claim for unlawful search).  Finally, a state-law remedy is not inadequate simply because a plaintiff failed to comply with a procedural hurdle, such as a statute of limitations.  <u>See</u> <u>Craig ex rel. Craig</u> <u>v. New Hanover Cty. Bd. of Educ.</u>, 363 N.C. 334, 340, 678 S.E.2d

---

[14] Unpublished opinions of the North Carolina Court of Appeals are not precedential but are cited for the persuasive value of their reasoning. <u>See</u> <u>In re Garvey</u>, --- N.C. App. ---, 772 S.E.2d 747, 751 n.3 (2015) ("[W]hile an unpublished opinion from a prior panel of this Court with substantially similar facts may be persuasive on appeal, it nonetheless carries no binding precedential weight.") (citations omitted).

351, 355-56 (2009); <u>Wilkins v. Good</u>, No. Civ 4:98CV233, 1999 WL 3320960, at *8 (W.D.N.C. Jul. 29, 1999).

Here, Plaintiffs allege claims for obstruction of justice, malicious prosecution, and negligent supervision under the North Carolina common law. Plaintiffs argue that these state-law remedies are inadequate to address their injuries because they are barred from bringing two of these claims against the City under the doctrine of sovereign immunity.[15] True, a state-law remedy cannot be adequate when it is "entirely precluded by the doctrine of sovereign immunity." <u>Craig</u>, 363 N.C. at 342, 678 S.E.2d at 356-57.[16] If Plaintiffs' claims against the City were the only means of redressing their alleged injuries under state law, then a direct constitutional claim might be appropriate. But here, North Carolina law provides numerous potential remedies for the injuries alleged by Plaintiffs, including claims against the

---

[15] <u>See</u> <u>supra</u> Part II.B (dismissing Plaintiffs' malicious prosecution and negligent supervision claims against the City). Plaintiffs concede that their obstruction of justice claim against the City is derivative of the same claim against the officers, and thus did not oppose summary judgment for the City on that claim. (Doc. 57 at 3—4.) As a result, the court need not consider whether this claim would also be barred by sovereign immunity.

[16] The plaintiff in <u>Craig</u> also brought a negligent supervision claim against a state employee in her individual capacity, but this claim was dismissed early in the litigation and was not appealed. 363 N.C. at 335 & n.2, 678 S.E.2d at & 353 n.2. Although the court held that the plaintiff's claims against the State did not provide an adequate state-law remedy, it did not directly address whether the plaintiff's claim against the employee might provide such an adequate state-law remedy.

21

Officer Defendants in their individual capacities. In fact, Plaintiffs' common law malicious prosecution claim is currently proceeding to trial against most of the Officer Defendants in their individual capacities.[17] Thus, Plaintiffs are not entitled to bring a direct constitutional claim in this case.

This court considered a similar situation in Edwards v. City of Concord, 827 F. Supp. 2d 517 (M.D.N.C. 2011). In Edwards, a tow truck operator sued a municipal police department after a police officer wrongfully accused him of stealing a car and forcefully restrained him, seriously injuring his shoulder. Id. at 518—19. The plaintiff brought claims for false arrest and assault and battery against the officer in his individual capacity and a constitutional claim against the officer in his official

---

[17] As the City points out (see Doc. 63 at 8-9), Plaintiffs' interests could also be protected through other common law claims, such as trespass to chattel and false imprisonment. See Rousselo, 128 N.C. App. at 448-49, 495 S.E.2d at 731 ("[T]he common law action for trespass to chattel provides a remedy for an unlawful search."); Alt v. Parker, 112 N.C. App. 307, 317–18, 435 S.E.2d 773, 779 (1993) ("[P]laintiff's claim for deprivation of due process is an attempt to vindicate his right to be free from restraint, which is the same interest protected by his common law claim for false imprisonment. Plaintiff's claim for false imprisonment, if successful, would have compensated him for the same injury he claims in his direct constitutional action."). Such state-law remedies are not rendered inadequate merely because Plaintiffs failed to pursue them within the applicable statute of limitations. See Craig, 363 N.C. at 340, 678 S.E.2d at 355–56; Wilkins v. Good, No. Civ. 4:98CV233, 1999 WL 33320960, at *8 (W.D.N.C. July 29, 1999) (dismissing direct constitutional claims when the plaintiff failed to file adequate common law actions within the applicable statute of limitations); see also LendingTree, LLC v. Anderson, 228 N.C. App. 403, 415, 747 S.E.2d 292, 301 (2013) (stating that actions for trespass to chattels are subject to a three-year statute of limitations in North Carolina) (citing N.C. Gen. Stat. § 1–52.).

capacity. Id. at 518. Assuming that any direct claim against the officer in his official capacity would be barred by immunity, id. at 522, this court nevertheless held that the plaintiff's claims against the officer in his individual capacity provided adequate state-law remedies for his injuries, id. at 524. In so holding, this court rejected the argument that the plaintiff's remaining claims were inadequate simply because they had to be asserted against the officer individually rather against than the municipality, or because those claims would require the plaintiff to prove that the officer acted maliciously. Id. at 522–24.

In sum, Plaintiffs' various common law claims against the Officer Defendants in their individual capacities provide adequate state-law remedies for their alleged injuries. Although Plaintiffs were not ultimately successful on two such claims, this fact alone does not permit Plaintiffs to bring a direct constitutional claim. See Craig, 363 N.C. at 339–340, 678 S.E.2d 351 at 355–56. As a result, summary judgment will be entered in favor of the City on Plaintiffs' state constitutional claims.

**F.    Expert Testimony of Ann C. Hamlin**

Finally, Plaintiffs move to exclude the expert testimony of Ann C. Hamlin. Plaintiffs claim that Defendants failed to disclose Hamlin in a timely manner[18] and did not produce an expert report

---

[18] In their initial brief, Plaintiffs rely only on the disclosure and

23

for her in accordance with Rule 26(a)(2) of the Federal Rules of Civil Procedure.

Pursuant to the court's initial scheduling order in this case, Defendants were to produce any "[r]eports from retained experts under Rule 26(a)(2)" by March 16, 2015, and to complete all discovery by May 8, 2015. (Doc. 32 at 3; Doc. 33 (order approving the parties' proposed Rule 26(f) report).) The court later extended the discovery deadline to July 7, 2015, by consent of the parties. Trial was scheduled for April 4, 2016. (Doc. 35.)

On June 17, 2015, Defendants informed Plaintiffs that they planned to call Hamlin, a Forensic Scientist Manager at the North Carolina State Crime Laboratory, as an expert witness at trial. (Doc. 39-1.) Defendants disclosed that Hamlin

> is expected to testify that it is not uncommon for samples of substances which were believed to be illegal controlled substances based on positive field testing to test negative for controlled substances under laboratory conditions at the N.C. State Crime Laboratory. She is further expected to testify that many substances which are not illegal controlled substances may produce color

report requirements of Rule 26(a)(2)(B) and this court's scheduling orders. (See Doc. 40.) In their reply brief, however, Plaintiffs argue for the first time that Defendants failed to comply with other disclosure requirements, including Rule 26(a)(2)(C) and Local Rule 26.1(c). (Doc. 55 at 6-8.) Per Local Rule 7.3(h), "A reply brief is limited to discussion of matters newly raised in the response." See also Tyndall v. Maynor, 288 F.R.D. 103, 108 (M.D.N.C. 2013) ("Members of this Court, however, have consistently held that '[r]eply briefs . . . may not inject new grounds . . . [and that an] argument [that] was not contained in the main brief . . . is not before the Court.'") (quoting Triad Int'l Maint. Corp. v. Aim Aviation, Inc., 473 F. Supp. 2d 666, 670 n.1 (M.D.N.C. 2006)). The City's response did not raise the issue of disclosure requirements under Federal Rule 26(a)(2)(C) or Local Rule 26.1(c), and the court will therefore not consider Plaintiffs' newly raised grounds.

changes in field test kit materials which may be interpreted as positive findings by law enforcement officers due to their subjective appreciation of color changes in the testing materials.

(Id. at 2.) Defendants did not produce a Rule 26(a)(2)(B) report for Hamlin. Plaintiffs took Hamlin's deposition on July 7, 2015. (Doc. 59.)

Rule 26(a) requires a party relying on expert testimony to disclose the expert's identity. In addition, if the expert is "one retained or specially employed to provide expert testimony in the case," the party offering the expert must provide a detailed written report containing various categories of information about the expert and her opinions. Fed. R. Civ. P. 26(a)(2)(B). Failure to provide the information required by Rule 26(a) in a timely fashion may result in exclusion of the expert's testimony. See Fed. R. Civ. P. 37(c)(1); Southern States Rack & Fixture, Inc. v. Sherwin-Williams Co., 318 F.3d 592, 596–97 (4th Cir. 2003).

The parties disagree as to the proper test for determining whether Hamlin qualifies as a "retained" expert subject to the report requirement in Rule 26(a)(2)(B). Plaintiffs cite authority for the proposition that an expert is retained when she has no personal knowledge of or involvement with the facts of the underlying dispute, apart from her participation in the litigation. See Stuart v. Loomis, No. 1:11-CV-804, 2014 WL 204214, at *2 (M.D.N.C. Jan. 17, 2014) (concluding that expert witnesses

25

were retained for the purposes of Rule 26(a)(2)(B) because they "are not and were never involved in the litigation"). Defendants, by contrast, cite authority for the position that an expert is retained when she receives compensation from the offering party in exchange for her services. See, e.g., Downey v. Bob's Discount Furniture Holdings, Inc., 633 F.3d 1, 6 (1st Cir. 2011) (concluding that an exterminator hired by the plaintiffs to eradicate bed bugs from furniture sold by the defendants was not a retained expert in subsequent litigation because he received no compensation and was testifying from firsthand knowledge of the facts); BorgWarner, Inc. v. Honeywell Intern., Inc., 750 F. Supp. 2d 596, 604-05 (W.D.N.C. 2010) (concluding that an expert witness was retained when the defendant paid the witness $105,000 to develop a tool for the purpose of using the expert's testimony about that tool in a preexisting patent dispute); McGuire v. Contemporary Developers, Inc., No. 99-CV-172, 2000 WL 33654984, at *1 (W.D. Va. May 24, 2000) (concluding that a municipal property inspector was not a retained expert in a dispute between a landlord and tenant when the inspector volunteered to testify and there was no evidence that the tenant had "any agreement with the expert concerning her participation" in the case).

The court finds that, while it is unlikely that Hamlin qualifies as a retained expert for the purposes of Rule 26(a)(2)(B), the question need not be definitively answered here.

That is because even when a party fails to "provide information or identify a witness as required by Rule 26(a)," the exclusion that ordinarily prevails is subject to an exception where "the failure was substantially justified or is harmless." Fed. R. Civ. P. 37(c)(1). District courts have "broad discretion to determine whether a nondisclosure of evidence is substantially justified or harmless." Southern States, 318 F.3d at 597. The Fourth Circuit has articulated five factors the court should consider when exercising this discretion:

> (1) the surprise to the party against whom the evidence would be offered; (2) the ability of that party to cure the surprise; (3) the extent to which allowing the evidence would disrupt the trial; (4) the importance of the evidence; and (5) the nondisclosing party's explanation for its failure to disclose the evidence.

Id. The first four factors primarily relate to the question of harmlessness, while the fifth factor relates primarily to a showing of substantial justification. Id.

Here, the first and fourth factors indicate that Plaintiffs suffered no harm from the manner in which Defendants disclosed Hamlin. Hamlin's testimony relates to a central issue in this case: whether the Officer Defendants mistakenly believed that they had discovered controlled substances in Jackson's home, or whether they knowingly and intentionally conspired to search Jackson's home and prosecute him without just cause. It should have been obvious to Plaintiffs that Defendants would seek to offer evidence

27

– whether from the Officer Defendants, other police officers, or employees of the State Crime Laboratory – to show that a reasonable police officer could honestly believe a substance to be illegal based on field testing, even if later laboratory testing shows otherwise. Plaintiffs could not have predicted the identities of the exact witnesses called to establish this point, but they cannot claim to be surprised by the content of Hamlin's testimony. And although other witnesses could potentially offer testimony on this issue, Hamlin's testimony is particularly important because of her experience and expertise in a laboratory setting.

The second and third factors also indicate that Plaintiffs suffered no harm from the manner in which Defendants disclosed Hamlin.[19] Defendants disclosed Hamlin on June 7, 2015, almost ten months before the scheduled trial date in this case. (Doc. 39-1.) Plaintiffs were permitted to take Hamlin's deposition on July 6, 2015, before the close of discovery and almost nine months before the trial date. (Doc. 59.) At her deposition, Hamlin provided essentially all of the information required by Rule 26(a)(2)(B). (See id. at 7:9–25 (opinions and the facts Hamlin considered in forming them), 10:22–12:9 (same), 19:22–21:12 (qualifications, prior testimony, and compensation), 21:18–20

---

[19] Apart from the report requirement, the scheduling order in this case did not set a deadline for the disclosure of experts that would encompass those who were not retained. See Doc. 32 at 3. Absent a stipulation, court order, or specific discovery request, experts must be disclosed at least 90 days before trial. See Fed. R. Civ. P. 26(a)(2)(d)(i).

28

(basis for opinion), 39:21–23 (publications), 43:8–16 (prior testimony).) Plaintiffs complain that they were unable to solicit rebuttal witnesses by the close of discovery, but they have not identified any rebuttal witness they would call or moved to reopen discovery in the six months since they took Hamlin's deposition.[20]

In sum, after considering the factors enumerated by the Fourth Circuit, the court concludes that any potential error in Defendants' disclosure regarding Hamlin was harmless. Consequently, the court need not decide whether she qualifies as a retained expert for the purposes of Rule 26(a)(2)(B), or whether Defendants' conduct was substantially justified.

## III. CONCLUSION

For the reasons stated,

IT IS THEREFORE ORDERED that the Officer Defendants' motion for partial summary judgment (Doc. 45) is GRANTED. All remaining claims against Defendant Yount are hereby DISMISSED WITH PREJUDICE. In addition, Count III of the complaint is DISMISSED WITH PREJUDICE as against all Defendants.

IT IS FURTHER ORDERED that the City's motion for summary

---

[20] Plaintiffs also complain that Defendants did not disclose Hamlin in time for her opinions to be effectively addressed at summary judgment. This argument is moot, as Defendants did not cite Hamlin's testimony in their motions for summary judgment. In fact, the only mention of Hamlin in the parties' summary judgment briefs comes from Plaintiffs. (See Doc. 57 at 8–9 (citing Hamlin's testimony as evidence that the Officer Defendants knew that they substances they found did not contain cocaine or heroin).)

29

judgment (Doc. 53) is GRANTED.  All claims against the City are hereby DISMISSED WITH PREJUDICE.

IT IS FURTHER ORDERED that Plaintiffs' motion to exclude the expert testimony of Ann C. Hamlin (Doc. 39) is DENIED.


                                    /s/   Thomas D. Schroeder
                              United States District Judge

February 5, 2016